IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 3, 2022

## IN RE JOSEPH D.

**Appeal from the Juvenile Court for Hickman County**
**No. 21-JV-133     Amy Cook Puckett, Judge**

_____

### No. M2021-01537-COA-R3-PT

_____

This appeal involves a petition to terminate parental rights. The juvenile court found by clear and convincing evidence that six grounds for termination existed as to the mother: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with a permanency plan; (3) persistent conditions; (4) severe child abuse; (5) failure to manifest an ability and willingness to assume custody or financial responsibility; and (6) mental incompetence. The juvenile court also found that termination was in the best interests of the child. The mother appeals. We affirm.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KRISTI M. DAVIS, JJ., joined.

Caleb Thomas, Hohenwald, Tennessee, for the appellant, Nabila L. N.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Derek K. Burks, Brentwood, Tennessee, Guardian Ad Litem.[1]

### OPINION

### I.     FACTS & PROCEDURAL HISTORY

Nabila L. N. ("Mother") is a mother to two children: David and Joseph. This matter

---

[1] On appeal, the guardian ad litem filed a notice that he was adopting the brief filed by the Tennessee Department of Children's Services.

only concerns Mother's second child, Joseph. Nevertheless, there are facts involving her first child, David, which are necessary to discuss. Additionally, we note that many of the facts and procedural history in this matter involve Darin L. D. ("Father"), but he voluntarily surrendered his parental rights to Joseph prior to the commencement of the trial.[2] Therefore, this matter only concerns the termination of Mother's parental rights as to Joseph.

David was born in Florida in 2014. His father passed away when Mother was five-months pregnant. Sometime later, Mother moved with David to Nevada, where she became involved in an abusive relationship with another man. In February 2017, she decided to move with David to Tennessee to be with Father, who was a friend that she had reconnected with online. In hindsight, Mother agreed that this was a poor decision because it put her and David in a bad position. According to Mother, Father had told her that he had a home and a job, but he had lied to her because he was actually homeless at the time. She explained that he was a different person than who she thought he was and that she became angry because he had lied to her. This led to a domestic violence incident where she threw a beer bottle at him during their first night together in a hotel room. Father stated that the bottle smashed against the wall and cut his arm. He said he left the room hoping that Mother would calm down, but when he returned, his things were thrown all over the room. He also had to clean up the broken glass which had scattered across the room into his luggage and on one of the beds. Mother admitted that her actions not only risked Father's safety during this incident, but she also risked David's safety because he was in the room with them.

Despite this incident, they continued to reside together and "jumped" from hotel to hotel until Father could obtain employment. Mother stated that some weeks were great but others were horrible because the domestic violence between them continued. She said that Father was an alcoholic and would often choke her when she would not give him money for beer. According to Father, however, Mother's behavior became worse as they continued their relationship. He believed that she had an anger problem due to a past health issue that affected her brain function. He said that there was a total of seven domestic violence incidents between them and that he was injured in six of them. For instance, she broke his glasses; punched him in the face; scratched him with her fingernails; broke items around their house; hit him in the head with an ashtray; and broke his column shifter in his vehicle. Father stated that he had scars from his injuries and that David witnessed some of these incidents. He described his time with Mother as "traumatizing." He also maintained that he did not instigate any of the domestic violence between them and that Mother was the aggressor.

---

[2] Father later testified at the trial that he was happy with where Joseph was placed. He stated that he knew that Joseph would be better off with his foster parents. While he thought that Mother loved Joseph, he felt that it would not be safe for Joseph to live with her.

In July 2017, the Tennessee Department of Children's Services ("DCS") became involved when it received a referral alleging physical abuse. According to the referral, a witness observed Mother throwing two-and-half-year-old David around "like a rag doll" at a laundromat and reported that she "threw him on the ground," "punched him in his head," and "hit [him] in the face with a baseball cap." When law enforcement arrived and questioned Mother, she denied punching David but admitted that she may have slapped him on his head. Law enforcement observed bumps on David's head consistent with a punch to the head, as well as numerous cuts, scrapes, and bruises. Mother reported that the injuries were from David falling all the time. That same day, a child protective services investigator ("CPSI") and an officer met with Mother at her home. David, who was just a toddler at the time, was observed to have bruises and scratches on his body and knots on the top of his head. Mother reported that the injuries were from David falling out of a wagon in the gravel driveway a week prior. She denied that she punched David but admitted that she had slapped him. The CPSI and Mother then went to a clinic, where Mother again reported to the medical staff that David's injuries were from playing in the gravel. The medical staff had major concerns and reported that the injuries were not consistent with Mother's story. Thus, Mother was arrested the following day and incarcerated for ten days on charges of child abuse.

DCS then filed a petition in the Humphreys County Juvenile Court, in which it alleged that David was dependent and neglected and was a victim of severe abuse. The juvenile court then entered a protective custody order awarding temporary legal custody to DCS and finding probable cause to believe that David was dependent and neglected. The court removed David from Mother's legal custody and placed David in the legal custody of DCS. Ultimately, after an adjudicatory hearing, the juvenile court entered an order in November 2017 finding clear and convincing evidence that David was dependent and neglected and was a victim of severe abuse.[3] Mother later testified about this particular incident at the laundromat, stating that David "became irate" and was "screaming his head off." She explained that she then took his wrist, she slapped him on his rear end, and apparently someone driving by the laundromat saw this and called the police. She admitted that she was angry that day because she had a lot going on and was overwhelmed. At first, she testified that she did not hit him too hard, although she admitted to leaving spank marks on him. However, she eventually admitted that she hit him too hard.

While Mother was incarcerated for child abuse, she discovered that she was pregnant with her second child. After her release, she continued to live with Father while she was pregnant, and her second child, Joseph, was born in February 2018. In July 2018, DCS received a referral which stated that law enforcement became involved in a domestic violence incident between Mother and Father. The referral reported that Mother had a knot

---

[3] In September 2018, the juvenile court entered an order discharging David from DCS custody and awarding legal custody of David to his paternal relatives who had cared for him since February 2018. The juvenile court entered a final order in David's case in March 2019.

on her head and Father had two black eyes.  According to the referral, Mother admitted to hitting Father but reported that he responded in kind.  However, Father denied hitting Mother and reported that Joseph was in Mother's arms when she hit him.  Mother and Father were both arrested and incarcerated.  A CPSI interviewed both Mother and Father while they were incarcerated and learned that domestic violence was common between them.  A child and family team meeting ("CFTM") was held a few days later in order to discuss concerns and services needed.  During that meeting, Mother admitted that she had anger issues which led to her oldest child, David, being removed from her care for severe abuse.  She also reported that she was participating in services but continued to have "anger outbursts."  Upon further investigation, the CPSI discovered that Mother was substantiated for the allegation of severe abuse against David.  The CPSI contacted the family service worker ("the FSW") in David's case to gather more information about Mother.  The FSW reported that Mother had "extreme anger issues" and that she had concerns about Mother's ability to parent by herself.  Furthermore, the FSW was concerned because services had been in place for a while, but Mother's issues were still occurring.

Mother and Father later testified about their domestic violence incident and told two different stories.  According to Father, Mother swung at him and broke his glasses in an argument between them.  He said that Mother became violent with him when he told her he wanted to take Joseph with him because he had safety concerns.  When she became violent, Father said that he began to pack his things into his vehicle and that he called law enforcement.  He reiterated that Mother was holding Joseph in her arms while she was hitting him.  Therefore, he said the only thing he did was hold her from hitting him.  He also said that he was bleeding from his injuries that she inflicted.  When law enforcement arrived, he stated that they were not going to arrest him at first, but Mother had a knot on her head and had claimed that he had punched her.  Father claimed that the knot on Mother's head came from her intentionally hitting her head against the wall.  He maintained that he did not punch her and had never hit a woman before.  Father said that law enforcement apparently examined his handprint and determined that the punch was self-inflicted.

Mother, however, testified that they had a horrible fight the night before Joseph was removed.  She stated that Father was on drugs, threatened to take Joseph, cussed at her, and called her a whore.  At one point, she stated that she could not remember what specifically happened but the bottom line was that he wanted to take Joseph from her.  She said she did not call law enforcement that night because she was "frozen" and "paralyzed" with fear.  Father slept on the couch that night while she and Joseph slept in the bedroom.  The following morning, Father allegedly yelled at her saying "give me my son" and threatened to grab Joseph while she was holding him in her arms.  Mother explained that she pushed Father in his chest to go out the door and "that's when all hell broke loose."  She claimed that she was scared and screaming because he was choking her, kicking her, and pulling her hair.  She denied that she punched him in the face stating that it was not possible while she was holding Joseph.  Yet, she admitted that she pushed him while she

was holding Joseph. Contrary to Father's testimony, she said that she was the one who called law enforcement. Additionally, she stated that she and Father separated at this time.

Following this incident in July 2018, four-month-old Joseph was removed from the home and placed in the care of paternal family members. DCS filed a petition in the Hickman County Juvenile Court, in which it alleged that Joseph was dependent and neglected. The Hickman County Juvenile Court entered an ex parte protective custody order finding probable cause to believe that Joseph was dependent and neglected. The court further found that it was reasonable for DCS to make no effort to maintain Joseph in the home under the circumstances. Therefore, the court removed Joseph from Mother's legal custody and awarded legal custody of Joseph to DCS. Several days later, the court entered an order transferring jurisdiction to the Humphreys County Juvenile Court due to David's case being in that court.

The first permanency plan was developed in August 2018 and ratified in November 2018. Mother's responsibilities from that plan are summarized as the following:

1. Refrain from incurring any other legal charges and resolve all current legal charges, make good peer choices, and refrain from associating with people who are using or selling illegal substances;
2. Continue attending therapy as recommended by her mental health intake and take medication as prescribed;
3. Submit to random pill counts and random drug screens;
4. Participate in and complete family violence/domestic violence counseling and utilize the skills learned in order to interact appropriately when discussing Joseph's well-being;
5. Begin therapeutic supervised visitation with Joseph, visit with Joseph consistently and as scheduled, bring and provide necessary items to Joseph during the visits, interact with Joseph in an appropriate manner, and supervise Joseph well during the visits;
6. Obtain and maintain a regular means of transportation;
7. Maintain a legal means of income in order to provide for Joseph and apply for low-income housing to free up more income to provide for other family needs;
8. Continue working with Healthier Beginnings; and
9. Work to develop a positive support system to assist her with the care of Joseph if needed.

Mother also signed the form setting forth the criteria and procedures for termination of parental rights. Soon after Mother began exercising visitation with Joseph, there was a verbal altercation between her and the therapeutic supervisor with Health Connect who was supervising visitation at the time. Joseph had been sick with a fever which resulted in a cancelled visit. At the next visit, Mother expected the cancelled visit to be made up and became frustrated when the supervisor said that would not happen. The supervisor reported

that Mother called her a "b***h." As a result of this altercation, Mother requested a new supervisor for visitation, and a new supervisor took the case. There was also an incident involving an acquaintance of Mother who was reported to have made threats toward Father. Father had text messages in which the acquaintance threatened to kill him. Mother denied that the acquaintance was her boyfriend, but the FSW at the time was concerned that this acquaintance had obtained Father's contact information. Afterward, Mother apparently ended things with the acquaintance because there was no other indication that they were involved with each other.

After an adjudicatory hearing, the Humphreys County Juvenile Court entered an order in December 2018 finding clear and convincing evidence that Joseph was dependent and neglected. The court noted in its order that Mother was participating in services, but DCS had reported "the original issues that brought this case to light [we]re still present and [we]re a concern." In January 2019, Joseph was removed from his paternal relatives and placed in his current foster home. Around this time, Mother began a relationship with a new paramour. The permanency plan was revised in January 2019 and ratified in May 2019. In addition to her previous responsibilities, Mother was required to do the following:

1. Continue to address domestic violence and anger management through her counseling at Centerstone;
2. Work with providers to schedule visits and ensure that the FSW and providers have a current phone number;
3. Complete a neuropsychological evaluation to help identify areas of organic damage and to provide recommendations of how she can parent Joseph more effectively;
4. Attend all court hearings and meetings regarding Joseph;
5. Obtain and maintain housing and utilities consistently which were appropriate for Joseph, provide a current address to the FSW, and update a change in phone number within 48 hours to ensure consistent access to visits and services; and
6. Answer calls, return texts, and communicate with providers consistently.

The plan noted that Mother had completed family violence services at the time. Again, Mother signed the form setting forth the criteria and procedures for termination of parental rights. Mother also filed a motion to transfer the case back to Hickman County noting that it was originally transferred to Humphreys County so that the case could be combined with David's case. However, David's case had been closed and only Joseph's case remained. As a result, the Humphreys County Juvenile Court entered an order transferring Joseph's case back to the Hickman County Juvenile Court.

The permanency plan was revised again in July 2019 and ratified in September 2019. In addition to her previous responsibilities, Mother was required to do the following:

1. Complete a parenting assessment to help identify the areas that needed to improve so that she could effectively parent Joseph in her home;

2. Continue to follow recommendations from her psychological evaluation;
3. Obtain all prescription printouts from her pharmacy to see if her medications were accidentally filled twice in the same month;
4. Continue working with Early Intervention through the Health Department during visits;
5. Obtain her permit, practice driving, and take her driver's license test again;
6. Provide proof of income to the FSW; and
7. Change shirts if she has been smoking cigarettes prior to a visit.

Furthermore, Mother's paramour was required to complete a mental health assessment and appropriate services. The plan noted that Mother completed a psychological evaluation with a parenting component in April 2019 and was following the recommendations from that evaluation.[4] However, the plan also noted that she was having difficulty retaining information in counseling. Again, Mother signed the form setting forth the criteria and procedures for termination of parental rights.

In September 2019, Mother and her paramour were involved in a domestic violence incident. Mother later testified about the incident stating that she pushed or hit her paramour beneath the shoulder during an argument because he was trying to leave her. She said that he responded by pushing her, hitting her, and choking her. At first, she testified that she could not remember where he hit her. Yet, when she was later asked how many times he hit her, she said, "I know once in the face. Just once that I remember." Regardless, she stated that it was bad enough that she had to call the police for help because she was scared. Her paramour admitted to hitting her, but he denied that he ever choked her. Although her paramour left after this incident, he later returned to live with Mother and was ultimately arrested in February 2020 for the incident. According to the FSW at the time, Mother did not disclose the incident; instead, she lied to DCS by stating that her paramour had left Tennessee to take care of his mother.

The permanency plan was revised again in June 2020 and ratified in September 2020. Mother's paramour was added to the plan because they were engaged at this point. In addition to her previous responsibilities, Mother was required to complete family violence counseling with her paramour through Health Connect. Her paramour was required to complete family violence counseling with Mother through Health Connect, participate in random drug screens, and submit to a background check. In October 2020, Mother and her paramour were involved in another domestic violence incident. Law enforcement responded to the incident and spoke with both Mother and her paramour. An officer who spoke with Mother testified that she was not consistent in what she told him and that what she told him was "jumbled" and "difficult to discern." Mother informed the

---

[4] Mother had already completed a psychological evaluation in David's case. Thus, she was following the recommendations of that evaluation, such as therapy, before she completed this psychological evaluation in Joseph's case.

officer that she grabbed her paramour's arms and that he then placed her on the floor at some point and began choking her. The officer observed a mark on Mother's lip and red streak running down her chin. The officer then spoke with the paramour who explained that he had enough of their relationship and began packing his things after a heated argument between them. He further explained to the officer that Mother grabbed him, bit his wrist, and jumped on his back. The officer observed a bite mark on the paramour's wrist and scratches on his back and neck, which were consistent with the injuries he said she inflicted. Mother was arrested for domestic assault as a result of this incident. Mother later admitted that she was the aggressor in this incident.

Following this incident, the permanency plan was revised again in October 2020 and ratified in February 2021. In addition to her previous responsibilities, Mother was required to follow all court orders and refrain from obtaining any new legal charges; complete a mental health intake with Camelot, be truthful regarding her anxieties and traumas, and follow all recommendations for services; and show proof of her lease and utilities and her payments for a minimum of four months. Additionally, the plan stated that her paramour was no longer allowed back in her home. The juvenile court entered an order stating that her paramour could not reside with Mother if Joseph returned to her home and that he could not participate in any visitation with Joseph. Mother signed the form setting forth the criteria and procedures for termination of parental rights in December 2020, but she refused to sign the same form in January 2021 without permission from her attorney.

Despite the plan's requirement and the court's order, Mother continued to allow her paramour to reside in her home until October 2021. In February 2021, Mother's paramour contacted the FSW at the time and informed her that Mother had attempted suicide. After becoming upset, Mother had taken a kitchen knife and cut her left wrist. As a result of the attempted suicide, she was hospitalized for approximately two weeks. Mother later testified about the attempted suicide and explained that she did not want to kill herself that day. Rather, she just wanted to cut herself to stop the emotional pain. Therefore, she disagreed that it was an attempted suicide, but she said she took responsibility for her actions. In April 2021, DCS filed a petition to terminate the parental rights of Mother alleging six grounds against her: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with a permanency plan; (3) persistent conditions; (4) severe child abuse; (5) failure to manifest an ability and willingness to assume custody or financial responsibility; and (6) mental incompetence. DCS also alleged that termination was in the best interests of the child.

In June 2021, there was yet another incident at a visit that resulted in law enforcement being called due to safety concerns. The visit was occurring outside Mother's home when a therapeutic supervisor reminded Mother to change Joseph's diaper, which was something she would do regularly throughout visitation because Mother had asked her for such reminders. Mother immediately became upset, and the situation escalated. Mother told the supervisor to "shut the f**k up." When the supervisor informed Mother

that the visit would be ending, Mother called her a "b***h." Mother later admitted to calling the supervisor a "b***h" in front of Joseph, but she denied cursing further. After this verbal altercation, Mother picked Joseph up and took him inside to attempt to change his diaper. She was visibly upset and was attempting to get the supervisor not to end the visit. At some point when they were inside, Joseph ran back to his bedroom to lay on his bed and Mother followed him. The supervisor attempted to remove Joseph from the situation, but Mother had knelt down and put her arms over him to prevent her from doing so. According to Mother, she did not want him to leave so she put her arms around him. Joseph appeared to be confused and upset and covered his face with his hands. Therefore, the supervisor became concerned and called law enforcement to intervene. When law enforcement arrived, an officer spoke with Mother to deescalate the situation and convinced her to let the supervisor take Joseph out of the home. According to the supervisor, Joseph appeared to be relieved after he was removed from the situation. Mother then came outside and apologized to the supervisor for the incident. Following this incident, the guardian ad litem filed a motion to suspend Mother's visitation and contact with Joseph. The juvenile court entered an order suspending Mother's in-person parenting time with Joseph but allowed her parenting time to continue via video. In October 2021, Mother filed an answer to DCS's petition. Among other things, she raised the affirmative defense of willfulness "to all grounds of abandonment." The juvenile court then held a two-day trial.

The court heard testimony from Ms. Daphne Baer, who was the FSW from July 2018 until October 2019. She ultimately did not feel that Mother had the ability to parent without assistance. She had several concerns regarding Mother: her behavior during visitation; her ability to care for Joseph unsupervised; her honesty; her compliance with medication; her ability to retain information; and her issues with domestic violence. Based on these concerns, she explained that DCS never reached the point where it felt that it could leave Joseph unsupervised with Mother while she had the case. As such, she never recommended for Mother to have unsupervised visitation stating that it would not have been wise. For instance, she explained that Mother had difficulty remembering things, which might lead to her giving Joseph too much medicine or formula. She also felt that Mother's mental health issues allowed her to be taken advantage of by men. She explained that the psychological evaluations identified that Mother had a phobia of being left alone which made her more accepting of men who did not treat her well. Additionally, if Mother was still with her paramour, she would be afraid to put Joseph back in the home based on the domestic violence issues and some of the paramour's traits.

Ms. Baer had some positive things to say about Mother. She testified that Mother maintained regular contact with her and that visitation was important to Mother. While she had the case, she stated that Mother completed a mental health intake and psychological evaluations, attended therapy, obtained employment, signed releases of information, completed classes, and participated in a parenting component in addition to her visitations. She even credited Mother for reading to Joseph in a way that kept him engaged at visits

and stated that she had never met a mother who could read so animatedly to a child. She testified that Mother worked hard to comply with the requirements of her permanency plan but was unable to retain information. Therefore, while Mother had been cooperative and completed services, the issue was that she failed to comprehend the information that was given to her and did not retain the information in order to change her behaviors. She felt that Mother could possibly overcome the issues in this case but explained that DCS also had to consider the question of how long it would wait for that to occur while it kept Joseph without stability and permanency.

Ms. Baer felt that she tried hard to help Mother as much as she could. Therefore, she did not feel that there was anything more she could have offered or done differently to assist Mother. She said she returned Mother's calls and text messages within a reasonable time. She went over the responsibilities of the permanency plan with her, helped her with services, and visited her regularly. She provided transportation for her to meetings, to court, to psychological evaluations, and to get job applications. She encouraged her to apply for low-income housing so that she would have more money available to purchase things she needed. She also felt that DCS considered Mother's limitations when providing services. She stated that Mother's case received much more attention than other cases because it was needed. For instance, some services such as domestic violence classes were provided more than once, and redirection on the same issues was provided several times. Thus, she said this case had lingered on a little longer than normal, but it was because Mother could not get to the point where she needed to be.

Ms. Baer testified that there were two prevalent themes while she had the case: Mother's obsession with David and her ability to anger easily. She stated that Mother seemed to think that if she could get Joseph back then she could get David back. This concerned Ms. Baer because it sounded like Joseph was just a tool to get David back. She knew that Mother loved Joseph, but stated that these repeated statements by Mother were odd and concerning. She further stated that Mother sometimes became frustrated and would raise her voice. She would have to intervene to calm Mother down and was unsure if Mother could calm down on her own.

Ms. Baer explained that sometimes loving a child is not enough if the parent cannot meet the child's needs consistently. She thought that DCS made reasonable efforts to try to help Mother make the changes she needed to make, but the case had been dragged out by Mother's actions. She explained that the case could have been resolved a lot sooner if there had not been anymore domestic violence, had there been more honesty, and had there been more progress with the mental health issues. She further explained that Mother put herself back in the same situation time and time again by not making better choices. As such, she believed that Mother had failed to demonstrate continuity and stability as evidenced by her continuing relationship with her paramour, her mental health issues, and the domestic violence incidents.

Ms. Brittany Rose was the FSW from November 2019 until March 2020. Like Ms. Baer, she felt that she did everything she could to assist Mother in the time she had the case. She stated that the biggest step on Mother's permanency plan at the time was her neuropsychological evaluation and that she helped Mother ensure that the evaluation was completed. She also attempted to conduct an unannounced home visit in December 2019. When she arrived at the home, Mother was getting ready to leave with some friends. She gave Mother the choice of completing the home visit but Mother chose instead to go with her friends. While discussing the situation, she said that Mother kind of became a little rude and said that this case was "ridiculous." In February 2020, she conducted a home visit, talked to Mother about the case at that visit, and said that Mother became hostile and yelled at her. She could not recommend that Joseph be unsupervised with Mother because she felt that he would not be safe with her. She had concerns about Joseph being in the home with Mother because of the domestic violence issues and Mother's paramour was still involved in her life. She thought that if Mother was willing to let her paramour stay after experiencing domestic violence, then she would allow him to stay if there was another incident in the future. As such, she did not think Mother's home was a safe place for Joseph.

Ms. Allison Goldman was the FSW from July 2020 until April 2021. She felt that progress was being made while she had the case. She explained that Mother was compliant with mental health services and her medication, was working, consistently participated in visitation, and wanted to see her son. She said that Mother even had the opportunity to participate in some unsupervised visits from September 2020 until October 2020. However, visitation reverted back to supervised visits after the domestic violence incident occurred in October 2020. Ms. Goldman found out about the incident because she had called Mother to participate in a meeting, but Mother was involved with law enforcement at the time. Despite the services offered to Mother, she felt that there were still issues such as a continuing theme of domestic violence in Mother's life. Additionally, she explained that Mother had agreed at one point that her paramour would no longer be in the home, but there came a time when Mother allowed him to reside with her again. She thought that Mother would continue to struggle with the mental health and domestic violence issues. She described these issues as a "cycle" and as "reoccurring." Given that Mother had just had a mental health crisis with the attempted suicide and that her paramour was still involved in her life, she did not feel that Joseph would be safe with Mother.

Ms. Irina Nance was the active FSW who was assigned the case in April 2021. She explained that Mother provided proof of employment and an appropriate home, participated in home studies, and provided proof of payment of her lease and utilities. However, she still had several concerns regarding Mother: her attempted suicide and history of domestic violence; her impulse-control and anger issues; her history of severe abuse; her changes in mental health providers; and her paramour's involvement in her life. She stated that Mother's mental health treatment had been "sporadic" because of the changes in mental health providers. She also stated that there were times when Mother had

been hostile toward her, talked over her, and raised her voice. She did not believe that Joseph would be safe in the home with Mother unsupervised. She also did not believe that Mother had the ability to parent Joseph safely and appropriately. She felt that Joseph had been in DCS custody too long as it is and that he could receive permanency and stability with his foster parents, which was something he could not receive with Mother at the time. As such, she concluded that it was in Joseph's best interests for Mother's parental rights to be terminated and for him to be adopted by his foster parents.

Some of the therapeutic supervisors from Health Connect testified about several instances where they observed Mother exhibit concerning behavior. There was one instance where Mother took a razor and began shaving her legs during a visit. Mother also left her hot coffee on the floor during the same visit and it was spilled, but fortunately it did not spill on Joseph. There was the visit in June 2021 where Mother cursed the supervisor and law enforcement had to be called to intervene. After some of the video visits, Mother would send emails blaming others because the visits did not go well. There was an instance where Mother had someone else in the room at the beginning of a video visit although no one else was supposed to be present. Initially, Mother denied that there was someone else in the room and then became irate and raised her voice when the supervisor asked her to turn the computer angle so that the remainder of the room was visible. After this visit, Mother called the supervisor and stated that she could have whoever she wanted in her home. There was also a visit where Mother became upset and was disrespectful toward the foster mother.

Both of the foster parents testified about Joseph's time in their home. Joseph had lived with them since January 2019. He referred to them as "mommy" and "daddy" of his own volition. He had a great relationship with them, his two foster siblings in the home, and the relatives on both sides of their family. They stated that he seemed happy and well-integrated in their home. The foster parents had taken Joseph on vacations and had engaged him in sports, family gatherings, and other activities. They testified that they were willing and able to adopt him.

Mother's paramour testified that he had been Mother's fiancé in the past. However, he explained that they were now just "extremely good friends" and did not currently live together. He wanted to be in a romantic relationship with Mother, but she had made it clear that could not happen at the time. He understood that she was putting Joseph above having a relationship with him. He was willing to respect that and wanted the best for her. Despite the history of domestic violence between them, he felt that they had a safe relationship and that children would be safe in the home with them if they were together.

Mother testified about her past health issues. She explained that her father was emotionally abusive and cold which had caused her to develop anorexia and self-harming behaviors. According to Mother, in 2008, she went into a coma for three-and-one-half months because she weighed only 55 pounds due to her eating disorder. She said she

survived the coma miraculously, but she sustained a speech impediment, physical impairments, and memory issues due to the incident. She also explained that she suffered from depression and anxiety and was prescribed medication for those diagnoses. She admitted that she struggled with abandonment issues. She also admitted that she found it difficult to control her anger due to the trauma she had experienced in the past. Otherwise, she stated that she was kind, loving, happy-go-lucky person who had a good heart. She also stated that she was getting better and better at controlling her temper.

Mother completed anger management services, domestic violence services, and mental health assessments as required by her permanency plan. There were also recommendations for her to receive treatment after her mental health assessments, which she followed up on. She started her mental health treatment at Centerstone, but she said they changed her therapist repeatedly. She had three different therapists at Centerstone over the course of a year-and-one-half period. She felt like the changes in therapists was a setback to her progress. She also said at one point her sessions were shortened and her in-person sessions went to online sessions in March 2020 because of COVID. She said the online sessions did not work because no connection was established. She informed the FSW that the online sessions were not helping her as much. She asked DCS to assist her in rearranging her therapists so that she could be in-person or do something that she felt was more beneficial to her. She felt that there were some setbacks to her mental health state because of COVID. At one point she said that DCS's efforts were "half-assed" because the services she was receiving were not sufficient. However, she felt that the FSWs helped her as much as they could. Mother participated in and completed classes in order to address her domestic violence issues. However, she admitted that she had a pattern of behavior from going from one domestic violence situation to another: the man in Nevada, Father, and then her recent paramour. Therefore, she could see why the domestic violence in her life was a concern.

There were times during Mother's testimony where her anger issues became apparent. At one point, Mother stated that counsel for DCS was giving her looks that were "weird," "nasty," "funny," and "threatening." At another point, Mother stated as follows:

> Yeah. Want to know the truth, I get angered when I'm being threatened by people so [you] can probably save all of your other questions cause people look at me like trash, she was in a coma, she's a piece of crap, she's trash. (indiscernible) looks down on me as if I'm trash and I feel like I want to be respected once in my life, just once. My mother loves me as a mother should and I would just like for one I'm a mother in life, have respect. I appreciate that greatly.

Counsel for DCS then asked if there was a way she could phrase her questions differently for Mother to feel respected. Mother responded, "That would be great if you could respect me . . . . I would appreciate that." She also stated, "I'm sure you can find a way [be]cause

- 13 -

you come across as a nice woman in general." When asked if she was arrested for the domestic violence incident in July 2018, Mother responded, "Yes. Finally. Yeah. There you go. Are you happy now? Yes, I was arrested." Further in Mother's testimony, counsel for DCS asked Mother if she was getting angry again. Mother stated, "No. Because it made me more of a smart aleck because you're giving me the attitude. I'd appreciate calming it down." She then said, "I'm not angry." Counsel for DCS responded, "Okay. So, you're good." Mother then stated, "That's how you perceive it. DCS has their own perception." Mother then continued to speak when counsel for DCS attempted to interject by saying "Let's go back." Mother then said, "Well, I'm not going to because . . . this is pertinent." After some discussion between the parties' counsels, the judge, and the guardian ad litem, Mother apologized and stated that she was just emotional.

Mother stated that the primary reason she and her paramour were no longer together was because DCS would not allow them to be together. She explained that Joseph came first in her life and he was her primary focus. Therefore, she testified that she would not allow her paramour to reside with her from this point forward. At the time of the trial, she said that they were just friends, that they could not be in a relationship, and that they were no longer residing together. At one point in her testimony, however, she admitted that they were still romantically involved; they were just no longer engaged. Yet, she admitted that the two of them could not raise a child together because of the domestic violence between them. In regard to Joseph, she believed that he was safe and happy with the foster parents. She appreciated the fact that the foster parents had done things for Joseph that she was unable to do at the time. She had nothing bad to say about them, respected them, and even said that she loved them. She said that they were "wonderful people" and "good foster parents." However, she wanted Joseph at home with her. She wanted a parent-child relationship with Joseph and would take that over anything. In conclusion, she stated that she loved Joseph unconditionally and that she would not give up on him.

In November 2021, the juvenile court entered an order terminating Mother's parental rights as to Joseph.[5] The court noted in its order that Mother's testimony lacked credibility at times. The court found clear and convincing evidence that six grounds for termination existed: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with a permanency plan; (3) persistent conditions; (4) severe child abuse; (5) failure to manifest an ability and willingness to assume custody or financial responsibility; and (6) mental incompetence. Additionally, the court found that termination was in the best interests of the child. Thereafter, Mother timely filed an appeal.

## II. ISSUES PRESENTED

1. Whether the juvenile court erred in finding that Mother failed to provide a suitable

---

[5] Two days after this order was entered, the juvenile court entered an amended order to make a slight correction to one of its statements.

- 14 -

home for the child;

2. Whether the juvenile court erred in finding that Mother failed to substantially comply with a permanency plan;
3. Whether the juvenile court erred in finding that the conditions which led to the removal of the child still persist at this time;
4. Whether the juvenile court erred in finding that Mother failed to manifest a willingness to personally assume legal and physical custody or financial responsibility of the child;
5. Whether the juvenile court erred in finding that Mother was mentally incompetent; and
6. Whether the juvenile court erred in finding that it was in the best interests of the child for the parental rights of Mother to be terminated.

For the following reasons, we affirm the decision of the juvenile court.

### III.    STANDARDS APPLICABLE TO TERMINATION CASES

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016)). "Parental rights have been described as 'far more precious than any property right.'" *Id.* (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interests of the children under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

- 15 -

Because of the heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review a court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). As for conclusions of law, "[t]he trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

On appeal, Mother presents issues concerning both the grounds for termination and the best interests of the child. However, she challenges only five of the six grounds found against her by the juvenile court. She does not present an issue challenging the juvenile court's finding for the ground of severe child abuse. Regardless, we must "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. Therefore, we review each of the six grounds for termination found against Mother and whether termination was in the child's best interests.

### A. *Grounds for Termination*

#### 1. *Severe Child Abuse*

A parent's rights may be terminated when "[t]he parent . . . has been found to have committed severe child abuse, as defined § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). As previously discussed, Mother is the mother of both David and Joseph. David was removed from Mother's custody by court order in July 2017 after DCS received a referral alleging physical abuse. In November 2017, the Humphreys County Juvenile Court entered an order finding clear and convincing evidence that David was dependent and neglected and was a victim of severe abuse "at the hands of [Mother]." As this Court has explained, "a trial court may rely on a prior court order finding severe child abuse and is not required to re-litigate the issue of severe abuse during the termination trial." *In re Alexis S.*, No. M2018-00296-COA-R3-PT, 2018 WL 6267180, at *10 (Tenn. Ct. App. Nov. 30, 2018); *see In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011); *State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10

(Tenn. Ct. App. Mar. 8, 2005). Therefore, we conclude that the juvenile court did not err in finding that DCS met its burden of proof on the ground of severe child abuse.

### 2. Abandonment for Failure to Provide a Suitable Home[6]

Another ground for termination of parental rights exists if abandonment by the parent has occurred. Tenn. Code Ann. § 36-1-113(g)(1). Under Tennessee Code Annotated section 36-1-102(1)(A), there are several alternative definitions of "abandonment." *See* Tenn. Code Ann. § 36-1-102(1)(A). One definition of abandonment is summarized as the failure to provide a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). Tennessee Code Annotated section 36-1-102(1)(A) defines abandonment for this ground as the following:

> (ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
> (*b*) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS must make "reasonable efforts" by utilizing its superior resources to help the parent find a suitable home. *In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020). To establish abandonment for failure to provide a suitable home, DCS must make these "reasonable

---

[6] In her answer, Mother raised the affirmative defense of willfulness "to all grounds of abandonment." However, the particular ground at issue in this case "does not contain a provision relating to willfulness." *In re River L.*, No. M2019-02049-COA-R3-PT, 2021 WL 830006, at *8 (Tenn. Ct. App. Mar. 4, 2021); *see* Tenn. Code Ann. § 36-1-102(1)(A). Furthermore, the word "willful" or "willfulness" does not appear in the transcript from the trial, and there was no testimony presented concerning this issue.

efforts" during a four-month period following the removal of the child. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*); *In re Rahjada W.*, 2020 WL 2893434, at *5. We note that "the establishment of a suitable home entails considerations as to whether '[a]ppropriate care and attention' are given to the child at issue." *In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *6 (Tenn. Ct. App. March 1, 2021) (quoting *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016)). Furthermore, "the proof necessary to support termination under this ground need not be limited to any particular four-month period after removal. As long as the proof relates to 'a period of four (4) months following the removal, . . . the ground may be established.'" *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)). Thus, our inquiry is not limited "to a period of four months *immediately* following the [child's] removal." *Id.*

In July 2018, DCS filed a petition in juvenile court alleging that Joseph was dependent and neglected. The juvenile court then entered an ex parte protective custody order finding probable cause to believe that Joseph was dependent and neglected and awarding temporary legal custody of Joseph to DCS. Therefore, Joseph was removed from Mother's legal custody and placed in the legal custody of DCS by a court order, which was the result of a petition filed in the juvenile court alleging dependency and neglect. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*a*). Additionally, the court found that it was reasonable for DCS to make no effort to maintain Joseph in Mother's home under the circumstances. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(b).

In regard to reasonable efforts made by DCS, Ms. Baer felt that she tried hard to help Mother as much as she could and that there was nothing more she could have offered or done differently to assist Mother. Permanency plans were developed and CFTMs were held for Mother. Ms. Baer went over the responsibilities of the permanency plan with her, helped her with services, visited her regularly, and returned her calls and text messages within a reasonable time. She provided transportation for her to meetings, to court, to psychological evaluations, and to get job applications. She encouraged her to apply for low-income housing so that she would have more money available to purchase things she needed. Ms. Baer said she went "above and beyond" because she genuinely wanted Mother to succeed.

DCS also accounted for Mother's limitations when providing services. Some services such as domestic violence classes were provided more than once, and redirection on the same issues was provided several times. Like Ms. Baer, Ms. Rose felt that she did everything she could to assist Mother in the time she had the case. She attempted two home visits in December 2019 and February 2020 and completed the latter one. She stated that Mother was rude to her and chose to leave with friends instead of completing the home visit during the attempted home visit in December 2019. During the home visit in February 2020, she talked to Mother about the case, but Mother became hostile and yelled at her.

Ms. Goldman felt that issues continued to occur throughout the case despite the services offered to Mother. Ms. Nance stated that there were times when Mother had been hostile toward her, talked over her, and raised her voice.

Moreover, Ms. Baer did not think it was appropriate that Mother allowed her paramour back in her home after the domestic violence incident in September 2019. Therefore, she had a conversation with Mother explaining that she had to make a choice between her paramour or her child. She said that Mother told her she would choose Joseph over anything, but Mother allowed her paramour to remain in her home until just a few weeks before the trial. Mother even allowed her paramour to remain in her home despite a court order in February 2021 stating that he could not reside with her if Joseph returned to her home. The domestic violence between them was also a concern if Joseph was to return to her home. Her attempts to overcome the issues in this case, such as the domestic violence, were described as a "cycle" and as "reoccurring." Although Mother said that DCS's efforts were "half-assed" and her services were insufficient, she testified that the FSWs helped her as much as they could.

We find that DCS made reasonable efforts to assist Mother to establish a suitable home for Joseph for well over four months following his removal. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*); *see In re Amber R.*, No. W2019-01521-COA-R3-PT, 2020 WL 7861247, at *5 n.6 (Tenn. Ct. App. Dec. 29, 2020) ("Here, DCS made reasonable efforts to assist Mother well beyond the required four-month period, giving her more time to demonstrate that she could establish a suitable home."). At the time of the trial, DCS had been involved for more than three years. Despite DCS's efforts over that three-year period, Mother failed to make reciprocal reasonable efforts to provide a suitable home and demonstrated a lack of concern for the child to such a degree that it appears unlikely that she will be able to provide a suitable home for the child at an early date. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*).

While Mother had an appropriate "physical living location," the environment of her home remained unsuitable for Joseph. *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (citations omitted). A suitable home "requires that the home be free of drugs and domestic violence." *Id.* (citation omitted). In the case at bar, there was fortunately no issue with the use of illegal drugs in the home. However, there were still concerns about domestic violence within Mother's home. As such, we conclude that the juvenile court did not err in finding that DCS met its burden of proof on the ground of abandonment for failure to provide a suitable home.

### 3. Substantial Noncompliance with a Permanency Plan

The third ground for termination at issue on appeal exists based on a parent's substantial noncompliance with the statement of responsibilities in a permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). In order to terminate a parent's parental rights under

this ground, the parent's noncompliance with the plan must be substantial and the requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547. When analyzing the requirements of the permanency plan, "noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id*. at 548. Determining whether a parent has sufficiently complied with a permanency plan "involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537.

There were several permanency plans developed throughout DCS's involvement. Early on, Mother worked hard to comply with her initial permanency plan. However, according to Ms. Baer, Mother's efforts were more like "check[ing] the boxes" because the services were not working. Ms. Baer explained that although Mother's intent was not just to check the box, that ended up being the end result because Mother failed to actually change her behavior. She felt like Mother was doing what she needed to do, but Mother did not recognize that she was not getting what she needed from her services, which created a barrier to progress. Nevertheless, we have recognized "that when analyzing this ground, '[o]ur concern is with the parent's *efforts* to comply with the plan, not the achievement of the desired outcomes.'" *In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *14 (Tenn. Ct. App. Dec. 22, 2020) (citations omitted) (emphasis in original). Stated differently, "'outcome achievement is not the measure of compliance.'" *Id.* (citations omitted).

In sum, Mother completed many requirements of these permanency plans. She consistently attended therapy for the most part. She completed a mental health intake, psychological evaluations, and a neuropsychological evaluation. She was compliant with mental health services and followed recommendations. She signed releases to provide information to DCS. She submitted to random pill counts and random drug screens. While there were times she was not compliant with her medication, there were times when she was, especially after the excess in her pill counts was addressed. She participated in family violence, domestic violence, and anger management services. She also completed services with her paramour when he was added to the plan. She participated in visitation with Joseph consistently. She recently bought a vehicle, thereby obtaining transportation for herself, and made the payments on the vehicle herself. She was employed at the time of the trial and had provided proof of her employment to DCS. She had a support system through her involvement with her church and Celebrate Recovery. She had a home that was an appropriate physical location. She paid her lease and utilities and provided proof that those were in her name. She maintained regular contact with the FSW. She participated in a parenting component in addition to her visitation. She also resolved her severe abuse charge by completing her three-year probation in October 2021.

In contrast, Mother did not make good peer choices by continuing her relationship with her paramour despite the domestic violence incidents and continuing to allow him to

reside in her home. This was in conflict with both the permanency plan and a court order. Although her paramour moved out a few weeks before trial, we agree with the juvenile court in that this was "too little and too late." She was required to refrain from incurring any other legal charges, but she was arrested after the domestic violence incident in October 2020. There were times she either lied or failed to disclose pertinent information such as the domestic violence incidents or her attempted suicide. There were times when she was inappropriate at visitation because she became frustrated or used profanities in front of Joseph. During her last in-person visit, law enforcement was called and had to intervene. There were times she did not take her medication as prescribed because there was an excess in her medication. After this, she was required to obtain a prescription printout to prove that her medications were accidentally filled twice in the same month, but that was never done.

We find that the requirements of the permanency plans were reasonable and related to addressing issues such as Mother's domestic violence and mental health issues. Furthermore, while Mother ultimately failed to change her behavior, she participated in services and completed many of the requirements of the permanency plans. As previously discussed, "'outcome achievement is not the measure of compliance.'"[7] *Id.* (citations omitted). If we were to merely count up the tasks in the plan, then this Court would be inclined to hold that Mother's efforts, or lack thereof, did not rise to the level of substantial noncompliance. Yet, as the juvenile court noted, Mother "resisted a key responsibility in the permanency plan and at a key point in the life [of] her child . . . ." Given the degree of her noncompliance and the weight assigned to requirements related to domestic violence issues, which was the very thing that led to Joseph's removal, we find that Mother was substantially noncompliant with the permanency plan. As such, we conclude that the juvenile court did not err in finding that DCS met its burden of proof on the ground of substantial noncompliance with a permanency plan.

### 4. Persistent Conditions

The fourth ground for termination at issue on appeal is commonly known as "persistent conditions." This ground for termination applies when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

---

[7] "While [the parent's] efforts are part of our analysis on substantial noncompliance with the permanency plan, the ground of persistent conditions focuses on whether the parent's efforts have been fruitful[.]" *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *17 (Tenn. Ct. App. Nov. 6, 2020) (quoting *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *20 (Tenn. Ct. App. Sept. 14, 2012)).

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element for this ground must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

This Court has explained that "[t]he necessary order of removal is 'the threshold consideration' for this ground." *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015)). As previously stated, in July 2018, DCS filed a petition in juvenile court alleging that Joseph was dependent and neglected. The juvenile court then entered an ex parte protective custody order finding probable cause to believe that Joseph was dependent and neglected. The court removed Joseph from Mother's legal custody and awarded legal custody of Joseph to DCS. DCS filed its petition to terminate the parental rights of Mother in April 2021, and the court held a trial in October 2021. Therefore, more than three years had passed from the time Joseph was removed from Mother's custody until the time the trial was held, which well exceeded the period of six months necessary for this ground and clearly accrued before the petition for termination was set to be heard. Tenn. Code Ann. § 36-1-113(g)(3).

The chief condition that led to Joseph's removal was domestic violence. In July 2018, DCS received a referral which stated that law enforcement became involved in a domestic violence incident between Mother and Father. Both Mother and Father were arrested and incarcerated. Before this particular incident, there were numerous other domestic violence incidents between Mother and Father. After Joseph's removal, Mother and her paramour were involved in domestic violence incidents in September 2019 and October 2020. Mother was arrested for the incident in October 2020. She admitted that she had a pattern of behavior going from one domestic violence situation to another and

could see why the domestic violence was still a concern at the time of the trial.

In addition to the domestic violence, there were concerns about Mother's mental health, namely her anger issues and her ability to parent by herself. Her anger issues were a prevalent theme throughout this case. At visitation, she called two different therapeutic supervisors a "b***h" and told one to "shut the f**k up." As previously discussed, law enforcement had to intervene at one of these visits. At another visit, Mother became irate and proceeded to raise her voice when the therapeutic supervisor at the time asked Mother to show her around the room with the computer because of a concern that someone else was in the room. There was one visit where she became upset and was disrespectful toward the foster mother. There were also times during her testimony where she appeared to lose her composure and become angry at counsel for DCS. Mother admitted that she found it difficult to control her anger due to the trauma she had experienced in the past. She also had memory issues due to a coma she suffered in 2008. Ms. Baer explained that Mother had difficulty remembering things because of this impairment, which was a safety concern. None of the FSWs who testified felt that Joseph would be safe with Mother. Mother also suffered from depression and anxiety and had attempted suicide in February 2021 because she was "depressed and losing it."

Mother was provided and participated in services in order to address her issues with domestic violence, family violence, and anger management. For some of these services, she participated in more than the normal amount that DCS usually provided. Ms. Baer even stated that Mother's case received much more attention than other cases because it was needed. However, Mother could not get to the point where she needed to be. We reiterate that Mother continued to put herself back in the same situation time and time again by not making better choices. For the foregoing reasons, we find that the conditions that led to Joseph's removal still exist preventing his safe return to Mother's care. Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Additionally, we find that there is little likelihood that these conditions will be remedied at an early date so that Joseph can be safely returned to Mother in the near future. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii).

More than three years had passed from the time Joseph was removed in July 2018 until the time of the trial in October 2021. Joseph had been in DCS custody for the majority of his life and had been in his current foster home since January 2019. The bonds he had formed with his foster parents and foster siblings were essentially all he knew. He referred to his foster parents as "mommy" and "daddy." He was cared for, happy, well-integrated, and comfortable in his foster home. Additionally, the foster parents were willing and able to adopt Joseph. Mother even agreed that Joseph looked to his foster parents as his actual parents because he had been there for so long. Given that more than three years had passed since Joseph's removal and that the conditions discussed above still persisted, we find that the continuation of the parent-child relationship would greatly diminish Joseph's chances of early integration into a safe, stable, and permanent home. Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). As such, we conclude that the juvenile court did not err in finding that

DCS met its burden of proof on the ground of persistent conditions.

### 5. *Failure to Manifest an Ability and Willingness*

The fifth ground for termination at issue on appeal exists when "[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). There are two prongs that must be proven by clear and convincing evidence to terminate parental rights under this ground: "(1) the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Our Supreme Court has explained that the first prong "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. As such, "clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness" satisfies the first prong of this ground. *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). "A parent demonstrates willingness 'by attempting to overcome the obstacles that prevent [him] from assuming custody or financial responsibility for the child.'" *In re Sylvia H.*, No. E2020-01009-COA-R3-PT, 2021 WL 1098630, at *6 (Tenn. Ct. App. Mar. 23, 2021) (quoting *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018)). "In determining whether a parent has manifested an ability to parent the child, a court 'focuses on the parent's lifestyle and circumstances.'" *Id.* (quoting *In re Jonathan M.*, 2018 WL 5310750, at *5).

As for the second prong, a court "examines the effect that placing the child in the parent's custody would have on the child—namely, whether the parent's assumption of custody would present 'a risk of substantial harm to the physical or psychological welfare of the child.'" *Id.* at *7 (quoting Tenn. Code Ann. § 36-1-113(g)(14)). To rise to the level of "substantial," we have held that the harm must present "'a real hazard or danger.'" *Id.* (quoting *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018)). Additionally, the harm must be "'sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *Id.* (quoting *In re Maya R.*, 2018 WL 1629930, at *8).

Mother continued to maintain a relationship with her paramour despite knowing that she could not have Joseph in her home if her paramour was still residing with her. Ms. Baer had a conversation with Mother explaining that she had to make a choice between her

paramour or her child. She said that Mother told her she would choose Joseph over anything, but Mother still allowed her paramour to remain in her home up until just a few weeks before the trial. Mother even allowed her paramour to remain in her home despite a court order in February 2021 which stated that he could not reside with her if Joseph returned to her home. This alone raised serious concerns about Mother's willingness to assume custody of Joseph.

In the same vein, Mother continued to maintain a relationship with her paramour despite the domestic violence between them. There were concerns about Joseph being in the home with Mother because of the domestic violence issues and Mother's paramour was still involved in her life. If Mother was willing to let her paramour stay after experiencing domestic violence, then she might allow him to stay if there was another incident in the future. Mother even said at one point during her testimony that she and her paramour had plans to see each other after the trial. She stated that they were no longer engaged but admitted that they were still romantically involved. Her continued involvement in domestic violence incidents and her inability to separate herself from her relationship with her paramour were circumstances that demonstrated Mother did not have the ability to assume custody of Joseph. Placing Joseph in Mother's custody while she continued such a lifestyle would pose a risk of substantial harm to him. Tenn. Code Ann. § 36-1-113(g)(14). For these reasons, it was reasonable to believe that harm to Joseph's welfare, such as witnessing a domestic violence incident, would occur again if he was placed in Mother's home. Therefore, we conclude that the juvenile court did not err in finding that DCS met its burden of proof on this ground.

### 6. *Mental Incompetence*

The final ground for termination at issue on appeal is mental incompetence. This ground for termination applies when:

> (8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent . . . is *mentally incompetent* to provide for the further care and supervision of the child, and to terminate that parent's . . . rights to the child;
> (B) The court may terminate the parental . . . rights of that person if it determines on the basis of clear and convincing evidence that:
> (i) The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future; and
> (ii) That termination of parental . . . rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent . . . to establish the parent's . . . ability to care for the child need be shown to establish that the parental . . . rights should be terminated[.]

Tenn. Code Ann. § 36-1-113(g)(8) (emphasis added).  We have explained in prior cases that:

> [t]he standard for this issue has been described as inquiring as to whether "by clear and convincing evidence [ ] the parent of the child is incompetent to adequately provide care and supervision because the parent's mental condition is so impaired and likely to remain so that it is unlikely that the parent will be able to assume care and responsibility for the child in the future." *State Dept. of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *14 (Tenn. Ct. App. May 30, 2002), *no appl. perm. appeal filed*.  This Court has affirmed this ground, in one instance, where the parent "functioned in such a low range that no amount of training, education, or counseling 'could bring him up to the level where he could parent these children.'" *State, Dept. of Children's Services v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008).

*In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *6 (Tenn. Ct. App. July 21, 2021) (quoting *In re Lorenda B.*, No. M2016-01841-COA-R3-PT, 2017 WL 1416858, at *9 (Tenn. Ct. App. Apr. 19, 2017)).  To meet the burden for this ground, DCS must "demonstrate two essential facts: (1) that Mother is *presently* unable to care for the subject children and (2) that Mother is *unlikely to be able to care for the children in the near future*."  *In re David J.B.*, No. M2010-00236-COA-R3-PT, 2010 WL 2889265, at *7 (Tenn. Ct. App. July 23, 2010) (citing Tenn. Code Ann. § 36-1-113(g)(8) (2010) (emphasis added)).

We have already discussed that Mother sustained memory issues due to a coma she suffered in 2008.  There were safety concerns that her memory issues might lead to some sort of harm to Joseph.  For instance, Mother needed reminders to change Joseph's diaper at visitation.  Another concern was her attempted suicide in February 2021.  Mother had taken a kitchen knife and cut her left wrist and was hospitalized as a result.  She had a history of self-harming behavior and had cut her wrists before the incident with the kitchen knife.  Mother completed psychological evaluations and a neuropsychological evaluation during DCS's involvement.[8]  One of the evaluations revealed that Mother had generalized anxiety disorder, major depressive disorder, and post-traumatic stress disorder.  Mother testified that she suffered from depression and anxiety and was prescribed medication for those diagnoses.  While Mother was prescribed medication for these diagnoses, there were times during this case when she was not taking the medication as prescribed because she

---

[8] The results of Mother's evaluations were not entered as exhibits.

had an excess in her medication. Furthermore, there was a secondary diagnosis that determined she had a mood disorder. Mother admitted that she found it difficult to control her anger. She had committed severe child abuse against her oldest child in July 2017, which she said occurred because she had "a lot going on" and was "overwhelmed." Her psychological evaluations also noted that she had an extreme fear of abandonment and would go to extreme limits not to be alone. There were concerns that this allowed her to be taken advantage of by men. Mother admitted that she struggled with abandonment issues. This was apparent given her continued involvement with her paramour even after the domestic violence between them.

Mother consistently participated in therapy in order to address some of these issues, but her therapist felt like "she was kind of butting her head against the wall" because progress was not being made. Mother completed other services related to her mental health, but those services did not change her behavior. Throughout this case, the FSWs and therapeutic supervisors had to deal with Mother's constant irate behavior, yelling, and profanities. Mother even demonstrated issues with controlling her anger at the time of the trial because she became frustrated several times with counsel for DCS. Ms. Baer opined that Mother would continue to be in the same position until she received some therapy that actually worked. Therefore, it seemed that Mother's mental health was presently so impaired and was so likely to remain so that it was unlikely she would be able to care of Joseph in the near future. Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

Like the juvenile court, we hope that Mother will continue to seek help through therapy in order to improve her mental health issues. However, Mother admitted having mental health issues for many years. She continued to struggle with her mental health from the time Joseph was removed from her care through the time of the final hearing, which was a period of more than three years. Despite the services provided to her, her mental health issues were no closer to being resolved than when Joseph was removed from her custody. As such, due to these mental health issues, we find that Mother was presently unable to care for Joseph and that she likely will be unable to care for Joseph in the near future. We conclude that the juvenile court did not err in finding that DCS met its burden of proof on the ground of mental incompetence.

### B. Best Interests of the Child

We now address the issue of whether termination of Mother's parental rights was in the best interests of the child.[9] "Effective April 22, 2021, the General Assembly [ ]

---

[9] In its order terminating Mother's parental rights, the juvenile court considered both the prior best-interests factors, which included just nine factors, and the amended best-interests factors, which now includes a total of twenty factors. The court did so presumably out of caution because the amendment to the statute which modified these factors went into effect just five days before the petition for termination was filed in this case. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, the amended best-interests factors are applicable here because they apply "to petitions for termination filed on or after April

amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, inter alia, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights." *In re Caroline R.*, No. E2021-00245-COA-R3-PT, 2022 WL 702392, at *12 n.7 (Tenn. Ct. App. Mar. 9, 2022) (citing 2021 Tenn. Pub. Acts, Ch. 190 (S.B. 205)). In considering these factors, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 878. Consequently, "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* We view the child's best interests from the child's perspective rather than the parent's perspective. *Id.* Finally, we "must consider all of the statutory factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). However, "a finding on each factor is not required." *In re Kaylene J.,* No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *18 (Tenn. Ct. App. May 26, 2021). The applicable best-interests factors are itemized as the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic

22, 2021." *In re C.T.*, No. E2021-01336-COA-R3-PT, 2022 WL 2236147, at *8 (Tenn. Ct. App. June 22, 2022) (quoting *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *14 n.10 (Tenn. Ct. App. Jan. 14, 2022)). Therefore, we only consider the amended best-interests factors that were in effect at the time the petition was filed.

- 28 -

symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific

needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). In analyzing these factors, the juvenile court found that all but three factors weighed in favor of termination. The court found that the remaining three factors, factors (F), (G), and (S), were inapplicable.

We first address those interrelated factors concerning the child's critical need for stability and continuity of placement, the effect a potential change of caretakers and physical environment would have on the child, and the child's parental attachments and emotionally significant relationships with persons other than parents and caregivers. Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (H), and (I). Joseph has lived with his foster parents since January 2019. The proof showed that he was cared for, happy, well-integrated, and comfortable in his foster home. He had a good relationship with the foster parents, his two foster siblings in the foster home, and the relatives on both sides of the foster parents' family. The foster parents were willing and able to adopt Joseph. Mother agreed that Joseph looked to his foster parents as his actual parents because he had been there for a majority of his life. Although she loved Joseph and did not want to give up on him, she understood that Joseph was not really familiar with her at this point. Based upon the proof, we agree that factors (A), (B), (H), and (I) weigh in favor of termination.

Mother has failed to demonstrate continuity and stability in meeting Joseph's needs. Tenn. Code Ann. § 36-1-113(i)(1)(C). Mother demonstrated this by her continuing relationship with her paramour, her mental health issues, and the domestic violence incidents. She also had a mental health crisis when she attempted suicide in February 2021. Mother lacked stability in her own life and, most importantly, failed to put Joseph's needs first by continuing to allow her paramour to live in her home. We agree that factor (C) weighs in favor of termination.

Mother and Joseph did not have a secure and healthy parental attachment, and there was no reasonable expectation that she could create such attachment. Tenn. Code Ann. § 36-1-113(i)(1)(D). There was little, if any, attachment between Joseph and Mother, at least on Joseph's end. Visitation was important to Mother, but it was difficult to keep Joseph engaged at visitation due to his age. Furthermore, Joseph never talked about Mother or

- 30 -

brought her up outside of visitation. He associated the computer with visitation and would ask if there was a visit when the foster parents opened up the computer. Sometimes he would run the other way when the foster parents would open up the computer. His relationship with the foster parents was more like a parent-child attachment compared to his relationship with Mother. He has not been able to form a bond with Mother like a young child usually does with a parent. Therefore, we agree that factor (D) weighs in favor of termination.

Mother consistently participated in visitation, but she did not cultivate a positive relationship with Joseph. Tenn. Code Ann. § 36-1-113(i)(1)(E). She took advice on how she could do better at visitation. She was even credited with keeping Joseph engaged at times, but she struggled to keep him engaged overall. Joseph's lack of engagement in visitation was somewhat understandable due to his age. Yet, Mother's efforts were offset by some of her inappropriate behavior during visitations, such as her anger, frustration, and use of profanities in front of Joseph. Additionally, we reiterate that Joseph never talked about Mother or brought her up outside of visitation. We agree that factor (E) factor weighs in favor of termination.

The proof shows that Mother failed to demonstrate a lasting adjustment of her circumstances to make it safe for Joseph to be in her home and failed to take advantage of available programs and services in order to make such a lasting adjustment. Tenn. Code Ann. § 36-1-113(i)(1)(J) and (K). Mother cycled through the same issues time and time again and failed to change her behavior. She continued to involve herself in domestic violence situations. She continued to allow her paramour to be involved in her life despite the domestic violence between them. She continued to exhibit concerning behavior at visitation. She participated in services but failed to demonstrate any lasting adjustment as a result of those services. Her failure to demonstrate a lasting adjustment was in spite of DCS's efforts. Tenn. Code Ann. § 36-1-113(i)(1)(L). Her case received much more attention than other cases. Services and redirection on the same issues were provided multiple times. Her case had lingered on longer than normal because she could not get to the point where she needed to be. Mother admitted that the problems that drug out this case were her fault. We agree that factors (J), (K), and (L) weigh in favor of termination.

Mother also failed to demonstrate a sense of urgency in gaining custody of Joseph or addressing the conditions that make it unsafe for Joseph to be in her custody. Tenn. Code Ann. § 36-1-113(i)(1)(M). Joseph had been in foster care for three years. Mother allowed her paramour to remain in her home despite the requirement of the permanency plan, a court order, and the domestic violence incidents between them. She failed to demonstrate any sense of urgency with this particular situation because he did not move out of her home until just weeks before the trial. She clearly understood that Joseph could not be in the home with her if her paramour was there; yet, she was reluctant to separate herself from her paramour. We agree that factor (M) weighs in favor of termination.

In regard to factor (N), Mother physically abused David, her older child, and engaged in domestic violence with both Father and her paramour. Tenn. Code Ann. § 36-1-113(i)(1)(N). The Humphreys County Juvenile Court found by clear and convincing evidence that David was a victim of severe abuse "at the hands of [Mother]." Furthermore, Mother was arrested as a result of the domestic violence incident in October 2020. We agree that factor (N) weighs in favor of termination. Additionally, we point out that Joseph was only in Mother's care for approximately four months of his life before he was removed because of domestic violence. At that time, David had already been removed from Mother's care because of severe abuse. Mother did not provide a safe and stable care for either David or Joseph. Tenn. Code Ann. § 36-1-113(i)(1)(O). Therefore, we also agree that factor (O) weighs in favor of termination.

Mother failed to demonstrate an understanding of Joseph's needs, the ability and commitment to creating and maintaining a home that met Joseph's needs, and did not have a physical environment in her home that was healthy and safe for Joseph. Tenn. Code Ann. § 36-1-113(i)(1)(P), (Q), and (R). Domestic violence was the reason Joseph entered DCS custody. Even after losing custody of Joseph, Mother continued to allow her paramour to remain in the home with her despite the domestic violence between them. She was involved in two domestic violence incidents with her paramour while Joseph was in DCS custody. Joseph, at the very least, needed a home free of domestic violence. Mother's home would not be safe and healthy for Joseph due to this continuing problem. We agree that factors (P), (Q), and (R) weigh in favor of termination.

It is evident that Mother's mental and emotional condition would be detrimental to Joseph and prevent her from parenting effectively. Tenn. Code Ann. § 36-1-113(i)(1)(T). As previously discussed, Mother had memory issues that raised concerns about her ability to parent Joseph; she was diagnosed with a mood disorder; she suffered from depression and anxiety and sometimes did not take her medication as prescribed; she had anger issues and abandonment issues; she had committed severe child abuse against her oldest child; and she had attempted suicide. We agree that factor (T) weighs in favor of termination.

Like the juvenile court, we find that factors (F), (G), and (S) are inapplicable. There was only one incident at an in-person visit at Mother's home which resulted in Joseph becoming confused and upset. There was no evidence that Joseph would fear living in Mother's home or that her home would trigger or exacerbate his experience of trauma or post-traumatic symptoms. Tenn. Code Ann. § 36-1-113(i)(1)(F) and (G). Additionally, Mother was under a child support order, but there was no indication in the record of whether she was current on her payments. Therefore, we do not consider factors (F), (G), and (S).

We have reviewed the best-interests factors and agree that it is in the best interests of Joseph for Mother's parental rights to be terminated. Accordingly, we conclude that the juvenile court did not err in finding that termination was in the best interests of Joseph.

## V.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the juvenile court.  Costs of this appeal are taxed to the appellant, Nabila L. N., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE